1
2
3
4
5
6
7
8                       UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10

11    SAMUEL BOYKIN,                          No. 2:23-cv-01516-TLN-SCR

12              Plaintiff,

13         v.                                 **ORDER**

14    UNUM LIFE INSURANCE COMPANY
      OF AMERICA,
15
                Defendant.
16

17

18         Plaintiff Samuel Boykin ("Plaintiff") was a former Maintenance Specialist for Valero

19    Services, Inc. ("Valero") who suffered a lumbar fracture as a result of a motor vehicle accident

20    ("MVA") in February 2014.  In November 2016, Plaintiff applied for long-term disability

21    ("LTD") benefits through his employer's insurer, Unum Life Insurance Company of America

22    ("Unum").  In June 2017, Unum denied Plaintiff's claim.  Plaintiff subsequently appealed

23    Unum's determination in December 2017, and Unum upheld its decision in April 2018.  Plaintiff

24    brought an action against Unum pursuant to the Employment Retirement Income Security Act

25    ("ERISA").  (No. 2:19-cv-00137-TLN-DB, ECF No. 1.)  On February 15, 2022, the Court found

26    Plaintiff was precluded from performing the duties of his physically demanding occupation as a

27    maintenance specialist under the insurance policy's "regular occupation" definition of disability,

28    which applied from July 18, 2016 through January 13, 2019.  (No. 2:19-cv-00137-TLN-DB, ECF

No. 41.)  Plaintiff did not make any specific argument in his briefs as to why he is entitled to

benefits past the initial 24-month period.  Because the administrator had not had the opportunity

to consider whether Plaintiff was disabled under its definition of "any gainful occupation," the

Court remanded the remainder of Plaintiff's claim for Unum to determine whether Plaintiff can

perform the duties of "any gainful occupation."  (*Id.*)

This matter is before the Court on the parties' Cross-Motions for Judgment under Federal

Rule of Civil Procedure ("Rule") 52 and Unum's Motion to Strike Plaintiff's Supplemental

Request for Judicial Notice.  (ECF Nos. 36, 37, 40.)  The motions are fully briefed.  (ECF Nos.

38, 39, 41–45.)  The Court has carefully considered the parties' arguments and hereby finds, for

the reasons set forth below, Plaintiff was disabled from any gainful occupation starting January

14, 2019, as defined in the applicable policy.  Accordingly, Plaintiff's Motion for Judgment is

GRANTED, Unum's Motion for Judgment is DENIED, and Unum's Motion to Strike is

DENIED.

## I.    FINDINGS OF FACT[1]

### A.    The Relevant Terms and Conditions of the Policy

1.    Unum issued a group long term disability policy number 564565 001 (the

"Policy") to Valero with an effective date of January 1, 2002.  (POL-2[2].)  LTD benefits under the

Policy are payable after an insured individual completes a 180-day Elimination Period, defined as

"a period of continuous disability which must be satisfied before you are eligible to receive

benefits[.]"  (*Id.* at 7, 37.)  The Policy provides in relevant part as follows:

### *HOW DOES UNUM DEFINE DISABILITY?*

You are disabled when Unum determines that:

---

[1]    The following findings of fact are taken mostly verbatim from Plaintiff's and Unum's motions for judgment.  (ECF Nos. 36, 37.)  The facts are undisputed except where noted by the Court.

[2]    Unum lodged the administrative record with the Court on July 17, 2024, and documents are bates-stamped UA-POL-LTD-000001 through UA-POL-LTD-000051 and UA-CL-LTD-000001 through UA-CL-LTD-005799.  (ECF No. 29.)  References to the Policy will be designated "POL" and references to the administrative record will be designated "AR."  Citations to bates numbers omit any other prefixes and the preceding zeros.

- you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and

- you have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury.

After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

(*Id.* at 19 (emphasis in original).)  The Policy further provides information on when payments stop and coverage ends:

### WHEN WILL PAYMENTS STOP?

We will stop sending you payments and your claim will end on the earliest of the following . . .

- after 24 months of payments, when you are able to work in any gainful occupation on a part-time basis but you choose not to[.]

### WHEN DOES YOUR COVERAGE END?

Your coverage under the policy or a plan ends on the earliest of . . .

- 30 days from the date you are no longer in an eligible group based on active employment as defined in the glossary . . .
- the last day you are in active employment except as provided under the covered layoff or leave of absence provision.

(*Id.* at 17, 25, 36, 39.)  The Policy also defines the terms below as follows:

**GAINFUL OCCUPATION** means an occupation that is or can be expected to provide you with an income within 12 months of your return to work, that exceeds:
80% of your indexed monthly earnings, if you are working; or
60% of your indexed monthly earnings, if you are not working.

. . .

**PART-TIME BASIS** means the ability to work and earn between 20% and 80% of your indexed monthly earnings.

(*Id.* at 37, 39 (emphasis in original).)

*///*

3

B.    The Court's February 15, 2022 Remand Order

1.    In its February 15, 2022 Order, the Court found Plaintiff adequately established by a preponderance of the evidence that he was disabled from his regular occupation during the Elimination Period (July 18, 2016 to January 13, 2017).  Plaintiff did not make any specific argument in his briefs as to why he is entitled to benefits past the initial 24-month period (January 13, 2017 to January 14, 2019).  Accordingly, the Court remanded Plaintiff's claim for Unum to determine whether Plaintiff can perform the duties of any gainful occupation as of January 14, 2019.

C.    Plaintiff's Medical History as of January 2019[3]

1.    Primary Physician: Plaintiff met with his primary treating physician, Dr. Minerva Saqui, on January 2, 2019 for a physical examination.  (AR 3572.)  Dr. Saqui noted the following:

> [C]hronic axial back pain and PTSD after MVA 2-23-2014, L1[4] burst fracture
>
> Mid back pain at a level of L1, constant, daily, intensity varies from 7 to 8, worse when standing 10 minutes or more, when leaning forward while standing, when walking downhill
>
> Associated tingling sensation in both lower legs, no weakness
>
> Does back stretching, walking as exercise 10 to 15 minutes at [a] time, total one hour 5 times a week

(AR 3573.)  Further notes show an otherwise normal physical exam, with the exception of "Back exam – tender upper lumbar spine and lumbar muscles, pain bending and extending 15 degrees" and "[s]ensation tingly and numb past the knees both lower extremities."  (*Id.* at 3575.)  Chronic low back pain and PTSD were listed on the "Patient Active Problem List."  (*Id.*)  With respect to his chronic back pain, Dr. Saqui noted that Plaintiff "wants to know if there is surgical intervention that can be done to alleviate the pain without risk of lower extremity paralysis."  (*Id.*)

---

[3]    The Court need not detail the specifics of Plaintiff's MVA and his medical history up to January 2019, as it is set forth in full in the February 15, 2022 Order.  (No. 2:19-cv-00137-TLN-DB, ECF No. 41.)

[4]    The spine is divided into three sections: the cervical spine, which is the neck area; the thoracic spine, which is mid-back; and the lumbar spine, which is the lower back.  A fracture at "L1" indicates that the fracture occurred in the uppermost vertebrae of the lumbar spine.

4

With respect to his PTSD, Dr. Saqui noted that he was "stable on Zoloft." (*Id.*)

2.      Dr. Saqui also ordered another MRI on January 2, 2019. (*Id.* at 3011.) The results of this MRI showed an "asymmetric disc bulge," "mild bilateral facet hypertrophy," and "[m]oderate bilateral neuroforaminal narrowing" at L2-L3 and L3-L4. (*Id.* at 3012.) The overall impression (compared to the prior MRI on August 3, 2015) is "[u]nchanged multilevel bilateral neuroforaminal narrowing" and "[c]hronic L1 burst fracture." (*Id.*)

3.      Updated Testing: On January 28, 2019, Plaintiff received lumbar x-rays that showed the "chronic L1 fracture" with "mild anterolisthesis of L5 upon S1" and degenerative changes "at the L4-5 and L5-S1 levels with intervertebral disc space narrowing and facet hypertrophy." (*Id.* at 3616.)

4.      Orthopedic Consulting Surgeon: Dr. Saqui ordered a new MRI and referred Plaintiff to a surgeon, Dr. Hans Bueff, for a consult. (*Id.* at 3350, 3596.) On January 28, 2019, Plaintiff met with Dr. Bueff, who noted Plaintiff had normal gait, normal sensory and motor exam, and full range of motion of all joints, but the back exam revealed "pain in the upper lumbar spine in flexion" and "[d]ecreased [range of motion] due to pain." (*Id.* at 3356.) Dr. Bueff ordered a bone scan, which was completed on April 25, 2019. (*Id.* at 3639.) The bone scan noted that there was "a compression deformity noted at the L1 vertebral body" and "[m]ultilevel mild degenerative facet changes, mild to moderate anterior ostephytes and spinous process osteophytes with corresponding degenerative uptake." (*Id.* at 3639–40.) In a patient message from Dr. Bueff to Plaintiff on June 13, 2019, Dr. Bueff reported that when he showed Plaintiff's case to his colleagues, all "spine surgeons voted against a fusion." (*Id.* at 3377.) Dr. Bueff noted the "fracture has healed," the "bone scan is negative," and the "MRI does not show inflammation." (*Id.*) In conclusion, Dr. Bueff stated that "[a] fusion does not help when the problem is muscular" and "there will not be a spine fusion as the fracture has healed in a good alignment." (*Id.*)

5.      Physical Medicine and Rehabilitation: Dr. Bueff reported Plaintiff was not a candidate for surgery and instead referred him to Dr. Alloysius Benny Kartono for pain management. (*Id.* at 3650–51.) During an office visit, Plaintiff told Dr. Kartono he already tried spinal injections and acupuncture but they were not successful. (*Id.* at 3388–92.) Dr. Kortono

1    prescribed a TENS unit for Plaintiff.[5]  (*Id.* at 3388–92, 3656.)

2        6.    Primary Physician: On October 30, 2019, Plaintiff saw Dr. Saqui again for an

3    office visit and reported numbness to both hands "worse when gripping and during cold weather."

4    (*Id.* at 3672.)  Plaintiff reported this impacted his ability to write, drive, and grip.  (*Id.*)  On

5    physical exam, Dr. Saqui noted a positive Phalen's[6] test in both hands and a decreased sensation

6    to touch in both hands, with the right more than the left, from fingertips to wrist level.  (*Id.* at

7    3673.)  However, a nerve conduction study on November 12, 2019 showed no abnormalities,

8    from which Dr. Saqui concluded Plaintiff's bilateral hand pain and numbness might be due to

9    osteoarthritis.  (*Id.* at 3430–33, 3446–47, 3699.)

10        7.    Physical Therapy: On September 1, 2021, Plaintiff had a telephone consultation

11    with DPT Nichele Roa for physical therapy.  (*Id.* at 2862, 3136–44.)  Roa noted that Plaintiff

12    presented "with significant activity intolerance" and "per subjective examination he has limited

13    and painful active range of motion."  (*Id.* at 3136.)  In a list of goals, Noa noted "be able to

14    tolerate standing for 60 minutes within 20 weeks" and "be able to lift 20 lbs to waist within 12

15    weeks."  (*Id.*)

16        8.    Plaintiff's Mental Health[7]: Before January 14, 2019, Plaintiff sought treatment for

17    anxiety, excessive worry, restlessness, memory and concentration problems, sleep problems,

18    flashback memories, post-traumatic stress disorder ("PTSD"), depression, and nightmares.  (*Id.* at

19    84, 461, 801, 823, 1349.)  Plaintiff thus far managed his PTSD, depression, and anxiety with

20    _____

21    [5]    A TENS (transcutaneous electrical nerve stimulation) unit uses low-voltage electrical
    currents to relieve pain.

22    [6]    The parties do not define a Phalen's test, but Cleveland Clinic defines it as "a series of
23    hand and wrist movements and positions healthcare providers use to diagnose carpal tunnel
    syndrome."  Phalen's Test, Cleveland Clinic,
24    https://my.clevelandclinic.org/health/diagnostics/25133-phalens-test (last visited May 27, 2025).

25    [7]    The Court's prior February 15, 2022 Order did not address Plaintiff's psychological issues
26    in-depth as the parties did not address whether they had an impact on his ability to work.  At this
    juncture, however, Plaintiff maintains that he sought treatment for psychological problems even
27    prior to leaving work, starting in 2014.  (ECF No. 36 at 14–15.)  Because the Court only evaluates
    whether Plaintiff was disabled under the Policy's definition of "any gainful occupation" as of
28    January 14, 2019, the Court only considers Plaintiff's mental health around that time.

Zoloft prescribed by Dr. Saqui. (*Id.* at 3573.) Plaintiff had a therapy visit with LCSW Jamie Hundley ("Hundley") on October 30, 2019, in which she noted that Plaintiff "is beginning to struggle with his 'memory going'" and his "health problems continue to worsen." (*Id.* at 3418.) Plaintiff spoke with Hundley again on September 9, 2020, in which she noted Plaintiff "is concerned about his memory loss" as well as "his back pain and lack of sleep." (*Id.* at 3474.) Hundley noted that she instructed Plaintiff to contact his doctor for assistance with these issues. (*Id.*)

9.    On December 24, 2020, Plaintiff completed an "AOQ – Adult Outcomes Questionnaire" on his mental health. (*Id.* at 3489–92.) Dr. Saqui messaged him on December 29, 2020, stating that his "score shows severe distress despite Zoloft" and that she would ask a "psychiatrist in Roseville as to next step[s] to help with mood, pain, [and] cognition." (*Id.* at 3496.) Plaintiff complained to Dr. Saqui in a message on July 14, 2021, about his memory problems: "It's to the point when I write things down to remember them, I forget where I write them down at (this is a daily occurrence)." (*Id.* at 2728.) On July 20, 2021, Dr. Saqui referred Plaintiff to neurology for further evaluation. (*Id.* at 2729.)

10.    Plaintiff saw Hundley for a follow-up phone appointment on July 27, 2021, in which he noted that he and his wife had an escalated episode and stated "all [of the] PTSD, anger, and pain from the accident and my injuries just came out." (*Id.* at 3832.) Plaintiff also noted on this call that he "was trying to rest his back when they began to quarrel." (*Id.*)

11.    On July 30, 2021, Plaintiff had a video visit with Dr. Kaho Wong in neurology. (*Id.* at 3845.) Dr. Wong noted Plaintiff was on a high dose of Zoloft and complained of memory changes, Cymbalta replaced the Zoloft, Plaintiff noted "improvement in psychiatric systems but with persistent memory issues," and that he "has difficulties in multi tasking and forgetful." (*Id.*)

12.    Plaintiff also saw LCSW Jonel Peters for a video visit on August 3, 2021, and Peters noted diagnoses of PTSD and major depressive disorder, recurrent episode. (*Id.* at 3863.)

13.    On September 2, 2021, Dr. Wong gave Plaintiff the Montreal Cognitive Assessment ("MOCA"), which requires a patient to complete a number of simple tests to assess cognitive functioning. (*Id.* at 3163, 3171.) Plaintiff's score was 21 out of 30 and his worst scores

1    were in language and delayed recall (memory).  (*Id.* at 3163.)  Dr. Wong noted that the evaluation

2    "noted for deficits in language and recall but improved with cueing."  (*Id.* at 3166.)

3                    D.    Unum's Review on Remand

4            1.    Unum Refers Plaintiff's File for Medical Opinions to Assess Plaintiff's Capacity

5    as of January 14, 2019: After this Court's February 15, 2022 Order (No. 2:19-cv-00137-TLN-DB,

6    ECF No. 41), Unum referred Plaintiff's file for medical opinions to assess his capacity as of

7    January 14, 2019.  Unum tasked Lacey Gentry ("Gentry"), a Lead Benefit Specialist, to handle

8    Plaintiff's claim.  (*Id.* at 5355–57.)  On May 3, 2022, Gentry reported that Senior Vocational

9    Rehabilitation Consultant Desiree Marziali ("Marziali") performed a vocational review and skills

10   assessment to determine whether there were alternative "gainful" occupations Plaintiff could

11   perform.  (*Id.* at 5358–61.)  Marziali opined there were no "sedentary" occupations that met this

12   threshold.  (*Id.* at 5360 (noting "No alt occs at sedentary due to gainful").)

13           2.    Unum Seeks Opinion from its Physician: On June 20, 2022, Gentry sought an

14   opinion from Unum physician, Dr. Donna Kim, as to whether Plaintiff could perform a light duty

15   job as of January 14, 2019.  (*Id.* at 5437.)  On June 21, 2022, Dr. Kim called Dr. Jinling Wang

16   Brendel (who became Plaintiff's primary care physician after Dr. Saqui retired in September

17   2021) (*id.* at 3180, 3246), who stated her restrictions and limitations ("R/Ls") were based on her

18   review of Plaintiff's previous records and the R/Ls Plaintiff told her he had at that time.  (*Id.* at

19   5436.)  Dr. Brendel noted the further R/Ls: "from 3/2018 to present, [Plaintiff] is limited to

20   continuous sitting up to 15 min at a time for total of 1 hr per day; limited to continuous standing

21   up to 15 min at a time for total of 2 hours per day.  This patient is placed off activity from 6/14/22

22   through 6/14/2032."  (*Id.* at 5438–39.)

23           3.    Dr. Donna Kim opined in a June 22, 2022 report that as of January 14, 2019,

24   Plaintiff was able to do full-time light work, which included: lifting, carrying, pushing, and

25   pulling twenty pounds occasionally, frequently up to ten pounds, or a negligible amount

26   constantly; and walking or standing frequently even though weight is negligible.  (*Id.* at 5438–

27   41.)  Dr. Kim further concluded: (1) exam findings (specifically, Dr. Bueff's January 28, 2019

28   exam and Dr. Saqui's January 2, 2019 exam) do not support that Plaintiff was precluded from

light work around January 14, 2019; (2) diagnostic test results do not support that Plaintiff was precluded from light work, noting the March 20, 2018 functional capacity evaluation ("FCE") by Sebastian Jurado, DPT ("Jurado"), was ten months old and evidence closer to January 2019 and beyond supported light work; and (3) intensity of care around January 14, 2019 does not support that Plaintiff was precluded from light work, as Dr. Bueff in 2019 reviewed Plaintiff's case with his colleagues and they recommended against a lumbar fusion as the fracture had healed and the lumbar spine MRI did not show any concerning inflammation.  (*Id.* at 5439–40.)  With respect to intensity of care, Dr. Kim further noted: Dr. Kartono's August 5, 2019 findings recommending a TENS unit and against epidural steroid injections; a January 2, 2019 office note from Dr. Saqui showing Plaintiff was taking Aleve for pain and Zoloft for PTSD, depression, and anxiety; and LCSW Hundley's October 30, 2019 appointment showed a depressed, irritable mood but no providers asserted R/Ls due to behavioral health conditions, including around January 14, 2019. (*Id.* at 5440.)

4. <u>Unum Seeks Independent Opinion</u>: Because there was disagreement between Dr. Brendel and Dr. Kim, Unum obtained an independent opinion from Designated Medical Officer ("DMO") Dr. Howard Grattan.  (*Id.* at 5454–57.)  Dr. Grattan reported on July 5, 2022, that Plaintiff was not precluded from full-time light work as of January 14, 2019 through his September 2021 MVA.  (*Id.* at 5454–57.)  Dr. Grattan acknowledged the treatment and exam findings of Drs. Saqui, Bueff, and Kartono, and LCSWs Hundley and Peters, diagnostic testing, continued treatment in 2020 and 2021, and a December 9, 2020 Social Security Administration notice of denial of benefits.  (*Id.* at 5455–56.)  In sum, Dr. Grattan concluded that as of January 14, 2019 through September 6, 2021, Plaintiff's "physician examination findings are within normal limits revealing normal strength, no significant change in sensory findings, normal gait, and balance, and although he has a chronic L1 burst fracture this would not prevent or preclude his ability for functioning within the outlined light occupational demands."  (*Id.* at 5456.)  Dr. Grattan stated that even though he has some decreased sensation in the upper extremities, the electrodiagnostic studies were normal and the symptoms would not prevent the light work demands.  (*Id.*)

5.     Dr. Grattan reviewed Plaintiff's "self-reported complaints," but found that "based on the physical and diagnostic findings in the medical records available for [his] review, these complaints are not of a severity to preclude the outlined light occupational demands." (*Id.*) Dr. Grattan considered Jurado's 2018 FCE but noted the more recent medical data. (*Id.*) He also noted Plaintiff's PTSD, depression, and anxiety, but found the mental status exams were "within normal limits and not indicative of a severe behavioral health-related functional impairment." (*Id.*) Dr. Grattan finally noted he found "no evidence of impairing medication side effects." (*Id.*)

6.     Unum Identifies Gainful Light Occupations Plaintiff Was Able to Perform as of January 14, 2019: On July 20, 2022, Marziali conducted a vocational analysis that incorporated her prior skills assessment and the findings of Drs. Kim and Grattan for light work. (*Id.* at 5461–65.) Marziali identified the following light work occupations that Plaintiff could perform based on his education and work history, medium demand regular occupation as a Maintenance Specialist, demonstrated skills and computer use, Plaintiff's residence, and a "gainful amount" as $29.39 per hour: (1) Coordination Preventative Maintenance (169.167-074) ($33.62/hour); and (2) Safety Technician (168.264-014) ($30.58/hour). (*Id.* at 5461–64.)

E.     The 2020 Social Security Administration ("SSA") Decision[8]

1.     On September 4, 2017, Plaintiff filed an application for a period of disability and disability assistance benefits, alleging disability beginning on July 26, 2016. (*Id.* at 2333.) On August 5, 2020, after holding two hearings at which Plaintiff appeared, SSA Administrative Law Judge ("ALJ") Linda Thomasson concluded the following:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: He can occasionally lift 20 pounds, and frequently lift 10 pounds. He can occasionally carry 10 pounds. He can sit 6 out of 8 hours in a workday, but not longer than 45 min at a time without being able to stand or walk at his desk 1-2 minutes, but could stay on task. He can stand 3 out of 8

---

[8]     The SSA issued its decision on August 5, 2020 — before the Court issued its February 15, 2022 Order finding Plaintiff precluded from performing the duties of his physically demanding occupation as a maintenance specialist under the insurance policy's "regular occupation" definition of disability, which applied from July 18, 2016 through January 13, 2019. (No. 2:19-cv-00137-TLN-DB, ECF No. 41.) However, the parties did not raise the SSA decision in its prior motions for judgment. Accordingly, the Court only considers the SSA decision at this juncture.

hours, but not longer than 30 min at a time, and then must sit 2-3 minutes. He can walk 3 out of 8 hours, but not longer than 20 at a time without sitting 2-3 minutes. He can stand/walk for a combined total of 6 out of 8 hours. He should avoid uneven surfaces. He can occasionally climb stairs and ramps with a railing. He can occasionally kneel, crouch or stoop, but not repetitively, and this must be spread out over the day, not more than 2-3 times at one time. He should avoid ladders/scaffolds/ropes, crawling, heavy vibratory machinery or dangerous equipment, unprotected heights and extreme cold exposure. He can frequently reach with the left upper extremity (left hand dominant). He is limited to work with a reasoning level of 2. He is limited to performing simple routine repetitive tasks. He can make simple work related decisions. He is limited to occasional interaction with the public, coworkers, and supervisors. He can tolerate occasional changes in [a] routine work setting.

(*Id.* at 2339.) ALJ Thomasson further found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform[.]" (*Id.* at 2346.) Notably, ALJ Thomasson concluded that "[t]he claimant has not been under a disability, as defined in the Social Security Act, from July 26, 2016, through the date of this decision[.]"[9] (*Id.* at 2347.)

2.    In reaching her decision, ALJ Thomasson explained that she followed a two-step process in which she first "determined whether there was an underlying medically determinable physical or mental impairment(s)." (*Id.* at 2339.) Second, "once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown," ALJ Thomasson "evaluate[d] the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." (*Id.* at 2340.) ALJ Thomasson reviewed Plaintiff's subjective reports of

---

[9]    The definition of "disabled" under the Social Security Act appears to be more stringent than the definition of "disability" under the Policy. *See Wentz v. Saul*, 473 F. Supp. 3d 1106, 1110 (E.D. Cal. 2020). Under the Social Security Act, a plaintiff is "disabled" if the plaintiff is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." *Id.* The SSA also uses a five-step sequential evaluation process, as the ALJ did in this case, to determine whether an applicant has a disability and is entitled to benefits. *Id.* The first step asks whether the claimant is engaging in a substantial gainful activity. *Id.* If not, then the second step asks whether the claimant has a "severe" impairment. *Id.* "Severe" is defined as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). In this matter, ALJ Thomasson concluded Plaintiff did not have "an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404[.]" (AR 2336.)

1    his pain, as well as the reports of Plaintiff's numerous doctors, care team members, and

2    examiners, Unum's medical examiners and file reviewers, SSA's own impartial medical expert,

3    state agency medical consultants, and Plaintiff's spouse.  (*Id.* at 2340–46.)  ALJ Thomasson also

4    carefully examined what she identified as Plaintiff's severe impairments (spine disorder, left

5    elbow disorder, depression, PTSD, and anxiety) and found that none of them "meets or medically

6    equals the severity of one of the listed impairments in [the federal regulations]."  (*Id.* at 2336–39.)

7         3.    ALJ Thomasson also found that Plaintiff was "unable to perform any past relevant

8    work," but that he could work as a Small Parts Assembler or Collator Operator.  (*Id.* at 2346–47.)

9                   F.    Unum Denies Plaintiff's Claim

10        1.    On August 5, 2022, Unum informed Plaintiff he did not meet the Policy's

11   definition of disability as of January 14, 2019, and therefore his LTD coverage ended as of that

12   date.  (*Id.* at 5471, 5473–83.)  Unum noted in its letter that "[w]hile the medical reviews did find

13   support for the opined restrictions and limitations after [Plaintiff's] September 06, 2021 [MVA],

14   this period is after [Plaintiff's] coverage under the [LTD] policy ended and therefore, not covered

15   under the policy."  (*Id.* at 5479.)

16        2.    Unum noted that in addition to physician reviews, its vocational rehabilitation

17   consultant reviewed Plaintiff's file and concluded his functional capacity "supported in the

18   physician reviews is compatible with" the occupations of Coordinator Preventative Maintenance

19   and Safety Technician.  (*Id.* at 5478.)  Unum further noted that these are not intended to be a

20   complete list of other occupations Plaintiff is able to perform.  (*Id.*)

21                   G.    Plaintiff Appeals Unum's Decision

22        1.    On January 26, 2023, Plaintiff appealed Unum's decision.  (*Id.* at 5631–38.)

23   Plaintiff retained Dr. Mechel Henry, MD to conduct an independent medical examination.  (*Id.* at

24   5635.)  Dr. Henry's report, dated October 12, 2022, was attached to Plaintiff's appeal.  (*Id.* at

25   5639–79.)  Dr. Henry reviewed Plaintiff's medical records and expert reports, including but not

26   limited to Dr. Grattan's review, the March 20, 2018 and March 18, 2022 FCE reports, and the

27   February 15, 2022 Order from this Court.  (*Id.* at 5635.)  Dr. Henry concluded that Plaintiff

28   "clearly could not return to work in any capacity after (and even before) 7/18/2016, his last date

1  of work" and "[f]rom Jan 14, 2019 to Sept 06, 2021, he was totally disabled from any occupation

2  to the present."  (*Id.* at 5635, 5655.)

3          H.      Unum Reviews Plaintiff's Appeal

4         1.      Unum Obtains Another Independent Opinion: On February 28, 2023, Unum

5  obtained an independent opinion from Dr. Arlen Green, DO, who is a California Board Certified

6  in Physical Medicine and Rehabilitation.  (*Id.* at 5703–08.)  Dr. Green completed "a full review of

7  the medical record, including prior clinical and medical reviews," and concluded that

8  "considering all the claimant's conditions, self-reported symptoms, clinical findings, reported

9  functional activities, and treatment intensity, the medical evidence does not support restrictions

10  and limitations precluding the performance of the outlined occupational demands on a full-time

11  basis as of . . . 1/13/2019."  (*Id.*)  The "outlined occupational demands" were specified as "[l]ight

12  occupational demands" — "lifting, carrying, pushing, and pulling 20 Lbs. occasionally,

13  frequently up to 10 Lbs. or negligible amount constantly; walking and[/]or standing frequently

14  even though weight is negligible."  (*Id.* at 5703.)  Dr. Green noted the following: Plaintiff's own

15  pain logs from 2014 through November 3, 2017; the 2019 MRI and bone scan; the August 5,

16  2019 exam; the March 2, 2021 x-ray of the left wrist; the opinion of FCEs in March 2018

17  (Jurado) and March 2022 (Durham); and Dr. Henry's October 2022 examination and Plaintiff's

18  demonstrated activity.  (*Id.* at 5704–06.)  Dr. Green found a lack of diagnostic exam findings and

19  noted the exam records from January 14, 2019 through September 6, 2021 showed Plaintiff's

20  "physical examination findings were within functional limits."  (*Id.* at 5705.)  Dr. Green further

21  noted Plaintiff was not prevented from work due to PTSD, depression, marital problems, or

22  chronic pain, noting the mental status exams and lack of evidence of psychomotor slowing.  (*Id.*

23  at 5704, 5707.)

24         2.      Unum Upholds Denial of Plaintiff's Claim on Appeal: On March 10, 2023, Unum

25  notified Plaintiff that it was upholding its claim decision on appeal.  (*Id.* at 5725–32.)  Unum

26  acknowledged Plaintiff's September 6, 2021, accident but explained "it was determined that the

27  available medical and file information did not document support for any conditions that would

28  have limited your client from performing the demands of the above identified gainful occupations

1   as of January 14, 2019." (*Id.* at 5726–27.)  Unum noted that, accordingly, his coverage under the

2   Policy had ended and Unum was unable to consider a new period of disability resulting from a

3   change and/or a worsening condition that occurs after coverage has ended.  (*Id.* at 5727.)

**II.    CONCLUSIONS OF LAW**

A.    Legal Standard

6       1.    Rule 52(a)(1) provides that "[i]n an action tried on the facts without a jury . . . the

7   court must find the facts specially and state its conclusions of law separately.  The findings and

8   conclusions may be stated on the record . . . or may appear in an opinion or a memorandum of

9   decision filed by the court.  Judgment must be entered under Rule 58."

10      2.    This Court has jurisdiction over Plaintiff's claims pursuant to ERISA.  *Clorox Co.*

11  *v. U.S. Dist. Court for N. Dist. of Cal.*, 779 F.2d 517, 521 (9th Cir. 1985) ("ERISA creates a

12  federal cause of action, with concurrent state and federal jurisdiction, over claims by an employee

13  'to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of

14  the plan, or to clarify his rights to future benefits under the terms of the plan.'" (quoting 29 U.S.C.

15  § 1132(a)(1)).

16      3.    "ERISA represents a careful balancing between ensuring fair and prompt

17  enforcement of rights under a plan and the encouragement of the creation of such

18  plans."  *Conkright v. Frommert*, 559 U.S. 506, 517 (2010) (internal citations and quotation marks

19  omitted).  "Congress enacted ERISA to ensure that employees would receive the benefits they

20  had earned, but Congress did not require employers to establish benefit plans in the first

21  place."  *Id.* at 516–17 (citing *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996)).

22      4.    The parties agree that the long-term disability plan at issue in this case is an

23  "employee welfare benefit plan" subject to ERISA.  *See* 29 U.S.C. § 1002(1) (defining "employee

24  welfare benefit plan" and "welfare plan" to include "any plan, fund, or program . . . established or

25  maintained by an employer or by an employee organization, or by both, to the extent that such

26  plan, fund, or program was established or is maintained for the purpose of providing for its

27  participants or their beneficiaries, through the purchase of insurance or otherwise[ ] . . . benefits

28  in the event of sickness, accident, disability, death or unemployment.").

14

5.     "[A] denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "[F]or a plan to alter the standard of review from the default of *de novo* to the more lenient abuse of discretion, the plan must unambiguously provide discretion to the administrator." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (italics added).

6.     Because the parties have not pointed to a provision in the policy vesting the administrator with discretionary authority, the Court finds *de novo* review to be the applicable standard of review in the instant case.

7.     *De novo* review "can best be understood as essentially a bench trial 'on the papers' with the District Court acting as the finder of fact." *Kollar v. Sun Life Assurance Co. of Canada*, No. C20-5278-JCC, 2021 WL 2949801, at *2 (W.D. Wash. July 14, 2021) (citing *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003)). "When conducting a *de novo* review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1295–96 (9th Cir. 2010) (italics added); *see also Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (explaining that in a trial on the administrative record, "[the] district judge will be asking . . . as he reads the evidence, . . . whether [the plaintiff] is disabled within the terms of the policy" and may "evaluate the persuasiveness of conflicting testimony and decide which is more likely true").

8.     This Court therefore does not examine whether Unum's actions were reasonable. *See Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 629–30 (9th Cir. 2009), (holding that, under abuse of discretion standard, the plan administrator's decision can be upheld if it is "grounded on any reasonable basis." (internal citation omitted)); *see also Conkright*, 559 U.S. at 521 ("Applying a deferential standard of review . . . means only that the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'"

1   (quoting *Firestone*, 489 U.S. at 111)).  Rather, the Court will examine the facts in the first

2   instance to determine whether Plaintiff is disabled.

3          9.      In an ERISA action, the plaintiff carries the burden of showing, by a

4   preponderance of the evidence, that he or she was disabled under the terms of the Plan during the

5   claim period.  *Oster v. Standard Ins. Co.*, 759 F. Supp. 2d 1172, 1185 (N.D. Cal. Jan. 5, 2011).

6                  B.    Analysis

7          1.      Plaintiff's singular claim is for the recovery of benefits under the Policy pursuant

8   to ERISA § 502(a)(1)(B).  (*See* ECF No. 1.)  Accordingly, the sole issue in the instant cross-

9   motions for judgment is whether Plaintiff was disabled from performing the duties of any gainful

10   occupation as of January 14, 2019.

11          2.      The parties dispute whether Unum should have reevaluated Plaintiff as of January

12   14, 2019, or the date of the Court's February 15, 2022 Order.[10]  (ECF No. 36 at 23–24; ECF No.

13   39 at 9–11.)  As stated previously in section A of the Findings of Fact, after an insured individual

14   completes a 180-day Elimination Period, the individual is considered disabled when Unum

15   determines that the individual "is limited from performing the material and substantial duties of

16   [the individual's] regular occupation due to [the individual's] sickness or injury."  (POL 19.)  The

17   Policy provides payments will stop "after 24 months of payments, when you are able to work in

18   any gainful occupation on a part-time basis but you choose not to."  (POL 17.)  As noted in the

19   prior Order, the initial Elimination Period covered from July 18, 2016 through January 13, 2017.

20   (ECF No. 41 at 20.)  Plaintiff was therefore entitled to 24 months of payments after the

21   Elimination Period, from January 13, 2017 through January 13, 2019.  Accordingly, a direct

22   application of the Policy requires Unum to reevaluate Plaintiff as of January 14, 2019.[11]

23   ─────────────────

24   [10]      Of note, Plaintiff suffered additional substantial injuries in another MVA on September 6,
     2021.  (ECF No. 36 at 15.)  Plaintiff asserts Unum evaluated whether he was disabled as of
25   January 14, 2019 "to avoid the impact" of this accident.  (*Id.* at 5.)

26   [11]      Plaintiff asserts three additional arguments as to why Plaintiff should be evaluated as of
     the date of the Court's February 15, 2022 Order.  (ECF No. 38 at 21–25.)  The Court finds each
27   of these arguments to be unpersuasive.
             First, the Court is sympathetic to Plaintiff's argument that it should not allow Unum to
28   benefit from any lack of contemporaneous evidence of disability in January 2019, as this was

16

3.    Therefore, the Court must determine whether Plaintiff was unable to perform the duties of any gainful occupation for which he is "reasonably fitted by education, training or experience" as of January 14, 2019.  (POL 19.)  Although it is a very close call, the Court finds the preponderance of the evidence ultimately supports the conclusion that Plaintiff was disabled from any gainful occupation starting January 14, 2019.

4.    Medical records from approximately January 2019 through September 9, 2021, demonstrate that Plaintiff continued to struggle with respect to his physical and mental health and abilities during this period.  None of Plaintiff's medical providers outlined clear R/Ls during this period.  Nevertheless, objective imaging, physical tests, and scans, combined with Plaintiff's self-reports of pain, establish that Plaintiff continued to experience chronic lower back pain.  These images, tests, scans, and reports ensured Plaintiff could not perform "the duties of any gainful occupation" for which Plaintiff was "reasonably fitted by education, training or experience."

---

solely due to its wrongful denial of benefits.  (ECF No. 38 at 21–23.)  However, the case law that Plaintiff cites is factually inapposite to the instant matter.  None of the cases speak to the issue of whether an evaluation or reevaluation date consistent with the insurance company's policy should be moved due to an insurance company defendant's otherwise wrongful denial of benefits to a plaintiff.

Second, the Court also finds unpersuasive Plaintiff's argument that Unum's decision to evaluate Plaintiff as of January 2019 is improper under state insurance law.  (*Id.* at 23–24.)  California Insurance Code § 662(a), which Plaintiff cites for the proposition that a cancellation notice be provided to the insured prior to the cancellation taking effect, primarily governs automobile insurance policies.  This code section is cited in 22 cases on Westlaw, the vast majority of which relate to automobile insurance policies.  Only one of these cases pertain to disability insurance, and it is an unreported case is about health insurers challenging temporary regulations issued by the California Department of Insurance to implement legislation regarding rescission, cancellation, and non-renewal of health benefit plans issued by disability insurers.  *Ass'n of Cal. Life & Health Ins. Cos. v. Dep't of Ins.*, No. C073105, 2017 WL 541927 (Cal. App. Feb. 10, 2017).  The court noted another case, *Mackey v. Bristol W. Ins. Servs. of Cal., Inc.*, 105 Cal. App. 4th 1247 (2003), which cites Insurance Code § 662 in the context of cancellation of automobile insurance, is unpersuasive.  *Id.* at *11.  Further, California Insurance Code § 10369.6, which Plaintiff acknowledges is a model provision for insurers to use in setting cancellation procedures, is not mandatory.  Finally, California Insurance Code § 10199.44(a), which requires an insurer to provide prompt notification upon cancellation of a group disability policy is not applicable because there has been no group disability policy that has been cancelled in this case.

Third, with respect to Plaintiff's argument that case law across jurisdictions establishes that, under well-established insurance law, cancellation of coverage is prospective only (ECF No. 38 at 25), the Court notes that Plaintiff only cites to out-of-circuit case law and no binding authority upon this Court.

1  (POL 19.)  Namely, as identified by Unum, Plaintiff was unable to perform the duties of

2  "Coordinator Preventative Maintenance" or "Safety Technician," which would have required

3  "lifting, carrying, pushing, and pulling 20 Lbs. occasionally, frequently up to 10 Lbs. or

4  negligible amount constantly; and walking and[/]or standing frequently even though weight is

5  negligible." (*Id.* at 5726.)

6      5.  **Plaintiff's back pain**: As noted in the Court's prior Order, the record reflects

7  Plaintiff sustained a fracture in his L1 vertebrae after a MVA in February 2014.  His condition

8  persisted despite physical therapy, acupuncture, and spinal injections.  As a result, Plaintiff

9  stopped work because of his pain after July 18, 2016.  Between January 2019 and September 9,

10  2021, Plaintiff was examined by his own primary treating physician, an orthopedic consulting

11  surgeon, a pain management specialist, and a physical therapist.  The objective tests and

12  observations of these doctors, as well as Plaintiff's self-reports of pain, confirm Plaintiff's

13  diagnosis of chronic low back pain.  Plaintiff's medical records support a finding, by a

14  preponderance of the evidence, that he could not perform "the duties of any gainful occupation"

15  as of January 14, 2019.

16      6.  **Plaintiff's mental health**: Between January 2019 and September 9, 2021, Plaintiff

17  had a number of visits with his therapist, LCSW Jamie Hundley.  During those visits, Hundley

18  noted that multiple mental status exams showed depression, impaired memory, and a restricted

19  affect.  However, neither Hundley nor any other mental health professional issued any R/Ls based

20  on these symptoms.  Further, an SSA determination by ALJ Thomasson on August 5, 2020, found

21  that Plaintiff "is limited to work with a reasoning level of 2.  He is limited to performing simple

22  routine repetitive tasks.  He can make simple work related decisions.  He is limited to occasional

23  interaction with the public, coworkers, and supervisors." (AR 2339.)  The Court notes that Unum

24  failed to take this well-reasoned conclusion into consideration when it denied Plaintiff's claim for

25  benefits, in part due to its finding that Plaintiff would have had transferable skills to the gainful

26  occupations of "Coordinator Preventative Maintenance" and "Safety Technician," both of which

27  require a reasoning level of 4.

28  ///

7.  **SSA Determinations**: "Although governed by different standards . . . SSA rulings are highly relevant to an ERISA disability determination." *Stratton v. Life Ins. Co. of N. Am.*, 589 F. Supp. 3d 1145, 1175 (S.D. Cal. 2022) (citing *Montour*, 588 F.3d at 635–36; *Bilyeu v. Morgan Stanley Long Term Disability Plan*, 711 F. App'x 380, 383 (9th Cir. 2017); *Perryman v. Provident Life & Accident Ins. Co.*, 690 F. Supp. 2d 917, 946–47 (D. Ariz. 2010)).  In some cases, as in the instant case, "the SSA deploys a more stringent standard for determining disability than does the governing ERISA plan." *Montour*, 588 F.3d at 636.  While Unum is not bound by the SSA's determination, "complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was the product of a principled and deliberative reasoning process." *Id.* at 635 (internal quotations and citation omitted).  "In fact, not distinguishing the SSA's contrary conclusion may indicate a failure to consider relevant evidence." *Id.*

8.  Here, ALJ Thomasson held a video hearing on January 9, 2020, and a telephonic hearing June 5, 2020.  (AR 2333.)  At the first hearing, Plaintiff and Tom Hunt, an impartial vocational expert, appeared and testified.  (*Id.*)  The hearing was continued to allow time for a medical expert to review the record and testify at a hearing.  (*Id.*)  At the second hearing, Plaintiff, K. Diane Kramer, an impartial vocational expert, and Dr. Allan Levine, M.D., an impartial medical expert, appeared and testified. [12]  (*Id.*)  Plaintiff's attorney was present at both hearings.  (*Id.*)  Plaintiff submitted additional written evidence before the scheduled hearing dates, which the ALJ admitted into the record.  (*Id.* at 2334.)  Further, as previously stated, ALJ Thomasson reviewed Plaintiff's subjective reports of his pain, as well as the reports of Plaintiff's numerous doctors, care team members, and examiners, Unum's medical examiners and file reviewers, SSA's own impartial medical expert, state agency medical consultants, and Plaintiff's spouse.  (*Id.* at 2340–46.)  ALJ Thomasson also carefully examined what she identified as Plaintiff's severe impairments (spine disorder, left elbow disorder, depression, PTSD, and anxiety).  (*Id.* at 2336–39.)  Given ALJ Thomasson's greater access to witness and expert

---

[12]    Due to the poor quality of the copy of the SSA decision in the administrative record, the Court makes an educated guess as to the names of the impartial experts.

testimony and thorough review of the record, the Court finds her conclusions well-supported and persuasive.

9.   **Weight afforded various doctors**: Treating physicians are not accorded any special deference in ERISA cases, but the Court may still evaluate the relative weight of reviewing physicians based on their opportunity to evaluate a plaintiff.  *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (determining that medical opinions rendered after in-person examination are more persuasive than contrary opinions following paper-only reviews of records); *Filarsky v. Life Ins. Co. of N. Am.*, 391 F. Supp. 3d 928, 942 (N.D. Cal. 2019) ("While deference is not necessarily owed to treating physicians in ERISA cases, conclusions drawn at the end of in-person medical examinations are inherently more helpful because the treating physician observes and interacts with the patient for several minutes at a time").  "A treating physician's opinion may merit less weight where, for example, the relationship between the claimant and the physician has been of short duration or where a non-treating specialist has pertinent expertise that the treating physician lacks."  *Filarsky*, 391 F. Supp. 3d at 939 (internal quotation marks omitted).  The weight given to an examining doctor's conclusions and diagnosis is based upon: "(i) the extent of the patient's treatment history; (ii) whether the examining physician specializes in the condition at issue; and (iii) how much detail the examining physician provides to support his conclusions."  *Id.* at 940.

10.   Plaintiff's primary treating physician, Dr. Minerva Saqui: Plaintiff's primary treating physician, Dr. Minerva Saqui, has a long history of treating Plaintiff for his spine-related health conditions since they first arose after the MVA in February 2014.  As the Court noted in its prior Order, Plaintiff has been seeing her with respect to his back pain since July 22, 2015, he has received many referrals from her to spine specialists and pain management assistance, and she has assisted him through the process of seeking disability benefits.  (ECF No. 41 at 22.)  Dr. Saqui interacted with Plaintiff for many years prior to her retirement in 2021 and made in-person observations as to his functionality, pain levels, and ability to work.  As the Court stated previously, even though Dr. Saqui is not a qualified disability examiner, because she treated Plaintiff for a significant length of time, the Court finds that her opinions are entitled to fairly

1    significant weight.

2         11.  With respect to Plaintiff's physical health, Dr. Saqui noted on January 2, 2019

3    office visit that Plaintiff reported continued pain:

4    > Mid back pain at a level of L1, constant, daily, intensity varies from

5    > 7 to 8, worse when standing 10 minutes or more, when leaning
     > forward while standing, when walking downhill

6    > Associated tingling sensation in both lower legs, no weakness

7    (AR 3573.)  Further, Dr. Saqui's physical examination of Plaintiff also showed that he had a

8    "tender upper lumbar spine and lumbar muscles, pain bending and extending 15 degrees[,]" and

9    "[s]ensation tingly and numb past the knees both lower extremities."  (*Id.* at 3575.)  Further, the

10   results of the MRI Dr. Saqui ordered on January 2, 2019 showed an "asymmetric disc bulge,"

11   "mild bilateral facet hypertrophy," and "[m]oderate bilateral neuroforaminal narrowing" at L2-L3

12   and L3-L4.  (*Id.* at 3011–12.)  The overall impression (compared to the prior MRI on August 3,

13   2015) is "[u]nchanged multilevel bilateral neuroforaminal narrowing" and "[c]hronic L1 burst

14   fracture."  (*Id.*)  At Plaintiff's October 30, 2019 office visit, Dr. Saqui saw him for numbness to

15   both hands, and he reported that it affected his writing, driving, and gripping.  (*Id.* at 3672.)  Dr.

16   Saqui reported a positive Phalen's test in both hands and a decreased sensation to touch in both

17   hands, with the right more than the left, from fingertips to wrist level.  (*Id.* at 3673.)  However, as

18   noted previously, a follow-up nerve conduction study showed no abnormalities and Dr. Saqui

19   concluded Plaintiff might have osteoarthritis.  (*Id.* at 3430–33, 3446–47, 3699.)

20        12.  With respect to Plaintiff's mental health, Plaintiff seemed to manage his PTSD,

21   depression, and anxiety with Zoloft prescribed by Dr. Saqui (*id.* at 3573) until the end of 2020, at

22   which point he showed "severe distress."  Dr. Saqui reported at the January 2, 2019 visit that he

23   was "stable on Zoloft."  (*Id.* at 3576.)  But after completing a questionnaire on his mental health

24   that Dr. Saqui messaged him on December 29, 2020 to state his "score shows severe distress

25   despite Zoloft" and that she would follow up with a psychiatrist for next steps.  (*Id.* at 3489–92,

26   3496.)  Dr. Saqui then referred Plaintiff to neurology in July 2021 for his reported memory

27   problems.  (*Id.* at 2728–29.)

28   ///

13. Plaintiff's therapist, LCSW Jamie Hundley: It appears to the Court that Plaintiff has seen Hundley on numerous occasions over several years, starting first with an initial assessment on August 26, 2016. (*Id.* at 813.)  At this visit, Plaintiff reported symptoms of anxiety, depression, sleep disturbance, and adjustment problems. (*Id.* at 813–14.)  On October 30, 2019,[13] Plaintiff saw Hundley for a follow-up appointment and expressed concerns about his depression, trauma, chronic pain, concentration, and memory. (*Id.* at 3418.)  Hundley noted his mental status exam was normal but showed a depressed and irritable mood and a restricted affect. (*Id.* at 3418–19.)  Plaintiff spoke with Hundley again on September 9, 2020, in which she noted Plaintiff "is concerned about his memory loss" as well as "his back pain and lack of sleep." (*Id.* at 3474.)  Hundley noted that she instructed Plaintiff to contact his doctor for assistance with these issues, that his mental status exam was normal except for a depressed and irritable mood. (*Id.*)  On July 27, 2021, Plaintiff saw Hundley for another follow-up appointment and expressed continued concerns about depression, anxiety, panic, PTSD, chronic pain, relationship problems, occupational problems, anger/emotion regulation, and mood instability. (*Id.* at 3832.)  Hundley noted that his mental status exam was within normal limits except for a depressed, anxious, irritable and sad mood. (*Id.* at 3833.)  She did not recommend any additional interventions at that time. (*Id.* at 3834.)  Hundley did not mention any R/Ls due to behavioral conditions in any of these visits.  The Court finds Hundley's opinions are entitled to a little weight.

14. Dr. Kaho Wong, Plaintiff's neurologist: The parties have noted that Plaintiff only saw Dr. Wong on two occasions — for a video visit on July 30, 2021 and for an office visit on September 2, 2021. (*Id.* at 3845, 3163.)  In the first video visit, Dr. Wong largely summarized Plaintiff's self-reported concerns and noted that he was being evaluated for dementia, but otherwise had no treatment notes other than stating Plaintiff is "to return to clinic for a cognitive eval, possibly neuropsychiatry referral if the screening is abnormal." (*Id.* at 3845, 3849.)  In the second office visit, Dr. Wong gave Plaintiff the MOCA and noted the following results:

---

[13]    It is possible that Plaintiff saw Hundley on other occasions between August 26, 2016 and October 30, 2019, but neither Plaintiff nor Unum cite any such visit and the Court declines to comb through the 5,000+ page administrative record to search for such visits.

Visuospatial/Executive: 5/5

Naming: 3/3

Attention (Numbers): 2/2

Attention (Letters): 1/1

Attention (Serial 7s): 3/3

Language (Repeat): 0/2

Language (Fluency): 0/1 (6 words)

Abstraction: ½

Delayed Recall: 1/5 (improve 1 with cueing)

Orientation: 5/6

**Score**: 21/30

The patient has normal speech.   No neglect.   Behaviors are appropriate.

Neck: supple

CN: Pupil equal and rounds, reactive to light bilaterally, extraocular eye movements intact, visual field full to confrontation, face symmetric, tongue midline

Motor: 5/5 strength upper and lower extremities, normal tone with no atrophy, rapid hand movements intact, no pronator drift

Coordination: no tremors, no dysmetria

Gait: normal narrow base with back brace, no bradykinesia, normal[] arm swings, 2 steps to turn

(*Id.* at 3163.)  Dr. Wong noted that Plaintiff's last head CT scan on March 2, 2021 was normal and finally noted the following:

MEMORY LOSS (primary encounter diagnosis)

Note: memory loss since 2016 mostly with focus and attention, but also forgetful.   He thought initially medication related but no improvement after psych medication changes.   He still ha[s] PTSD symptoms and difficulties with sleep.   Not significant issues for self care and IADL dependent possibly related to physical conditions (chronic back pain unable to put short[s] on).

Cognitive eval noted for deficits in language and recall but improved with cueing.  FTD language variant?  Given age gp [sic], complicated

1     by underlying PTSD and chronic pain history affecting sleep
2     chronically.

3     Neuropsychiatry eval referral sent.

4   (*Id.* at 3166.)  The parties only cite to two visits Plaintiff had with Dr. Wong, meaning Plaintiff's

5   relationship with Dr. Wong appears to have been only of a short duration.  However, the record

6   reflects that Dr. Wong is a doctor in neurology, and he was able to examine Plaintiff in-person

7   and complete an objective assessment of Plaintiff's abilities.  The Court therefore finds that his

8   opinions are entitled to some weight.

9          15.  Unum physician, Dr. Donna Kim: As previously noted, Unum sought an opinion

10  from its physician, Dr. Donna Kim, a family medicine physician, who stated in her June 22, 2022

11  report that exam findings, diagnostic testing, and intensity of management around the time of

12  January 14, 2019 does not support that Plaintiff is precluded from performing light occupational

13  demands.  (*Id.* at 5439–41.)  However, the Court finds persuasive Plaintiff's argument that Dr.

14  Kim disregarded the March 2018 Jurado FCE because it was "10 months old" but does not

15  provide citation to evidence or explanation as to how Plaintiff's work capacity had somehow

16  improved since this FCE.  (ECF No. 36 at 18.)  Further, Dr. Kim never conducted an in-person

17  evaluation of Plaintiff, never spoke to Plaintiff, and only completed a file review.  In light of this,

18  the Court finds Dr. Kim's opinions are entitled to little weight.

19         16.  Unum's hired independent medical examiner, Dr. Howard Grattan: Because there

20  was disagreement between Dr. Kim and Dr. Brendel (Plaintiff's new primary treating physician),

21  Unum obtained an independent opinion from Dr. Grattan, whose findings are noted above.  (*Id.* at

22  5454–57.)  Plaintiff argues Dr. Grattan has made an appearance in no less than 37 federal court

23  opinions (including one litigated by Plaintiff's counsel) and judges in these opinions "are critical

24  of Dr. Grattan's bias in favor of whatever insurer is paying him as well as his practice of

25  dismissing the insured's evidence of disability with unexplained and conclusory statements that it

26  was 'inconsistent with the physical examination findings and diagnostic studies in the record."

27  (ECF No. 36 at 19 (citing *Brainard v. Liberty Life Assurance Co. of Bos.*, 173 F. Supp. 3d 482,

28  492 (E.D. Ky. 2016)).)  Plaintiff contends that, similar to *Brainard*, Dr. Grattan discounts

1    Plaintiff's evidence of disability based on conclusory and unexplained statements.  (*Id.*)

2         17.  The Court notes that Dr. Grattan's report is approximately three pages in length,

3    the majority of which is a summary describing the records that he reviewed.  (AR 5454–57.)  The

4    last page is entitled "DMO Conclusion," but this section provides scant analysis and is still

5    largely a summary describing the records he has reviewed.  (*Id.* at 5456.)  Further, the little

6    analysis that Dr. Grattan provides is conclusory and provides hardly any explanation.  Dr. Grattan

7    states: "The claimant's self-reported complaints are considered, however, based on the physical

8    and diagnostic findings in the medical records available for my review, these complaints are not

9    of a severity to preclude the outlined light occupational demands." (*Id.*)  But Dr. Grattan does not

10   explain which physical and diagnostic findings in the medical records allow for Plaintiff to

11   complete the light outlined occupational demands.  Dr. Grattan further states regarding the Jurado

12   FCE in March 2018: "[T]here is medical data that occurred after the FCE that has been reviewed

13   and considered regarding the claimant's conditions, symptoms and functionality including but not

14   limited to, updated diagnostic imaging studies from January of 2019 and orthopedic follow up."

15   (*Id.*)  Even if Unum were correct that Dr. Grattan's opinion was based on a more comprehensive

16   review and included records not available to PT Jurado (ECF No. 39 at 19), the Court finds

17   persuasive Plaintiff's assertion that Dr. Grattan does not explain how these updated diagnostic

18   imaging studies and orthopedic follow up necessarily contradict the findings of the FCE (ECF

19   No. 36 at 19).  Dr. Grattan also notes in a summary-type fashion: "It was stated that the claimant

20   had some deficits in language and recall but this was improved with cueing and would not be

21   expected to impact the claimant's ability to function overall."  (AR at 5456.)  This excerpt refers

22   to the MOCA and the Court does not find anywhere in Dr. Wong's summary or findings a

23   statement that the deficits in language "would not be expected to impact [Plaintiff's] ability to

24   function overall." (*Id.* at 3163–66.)  Dr. Grattan also provides no explanation as to why this

25   would not be expected to impact Plaintiff's ability to function overall.

26        18.  The Court further finds persuasive Plaintiff's argument that Dr. Grattan failed to

27   consider Hundley's mental status exams.  (ECF No. 38 at 10.)  Dr. Grattan concludes "while the

28   documentation notes that the claimant has PTSD, depression, and anxiety, the mental status

exams are within normal limits." (AR 5456.) However, Hundley noted in a mental status exam on October 30, 2019 that Plaintiff had a "guarded" demeanor, a "depressed and irritable" mood, a restricted affect, and that he was "experiencing impairments" in memory. (*Id.* at 3677.) In a mental status exam on September 20, 2020, Hundley noted Plaintiff was "depressed and irritable." (*Id.* at 3733.) Finally, in a mental status exam on July 27, 2021, Hunley noted Plaintiff was "depressed, anxious, irritable and sad." (*Id.* at 3833.) The Court also agrees with Plaintiff that Dr. Grattan does not appear to know the difference between a mental status exam and a MOCA. (ECF No. 38 at 10.) Dr. Grattan notes of Plaintiff's September 2, 2021 consult with Dr. Wong that "The mental status exam is a 21/30." (AR 3161–66.) As Plaintiff correctly notes, a mental status exam does not receive a numerical score. (ECF No. 38 at 10.)

19. The Court also notes that Dr. Grattan never physically examined Plaintiff. Unum also does not provide clear information on how long Dr. Grattan has been reviewing medical records in claims for LTD benefits.[14] (*Id.*) Based on the foregoing, the Court is largely unpersuaded by Dr. Grattan's report and finds that it is entitled to little to no weight. *See Delaney v. Prudential Ins. Co. of Am.*, 68 F. Supp. 3d 1214, 1229 (D. Or. 2014) (finding ERISA claims administrator was not free to refuse to credit beneficiary's reliable evidence, including opinions of her treating doctors, when denying her claim for LTD benefits, even though it was not required to give the treating doctor's opinion special weight); *see also Oldoerp v. Wells Fargo & Co. Long Term Disability Plan*, 12 F. Supp. 3d 1237, 1255 (N.D. Cal. 2014) ("when an in-person medical examination credibly contradicts a paper-only review conducted by a professional who has never examined the claimant, the in-person review may render more credible conclusions").

///

---

[14] The Court notes that Unum attempts to introduce the curriculum vitae ("CV") for Drs. Kim, Grattan, and Green through the declaration of its counsel Nicole Y. Blohm. (ECF Nos. 39-2–39-5.) Plaintiff objects to the introduction of these CVs on the grounds that there is inadequate foundation and Unum makes no showing as to why these extrinsic records are necessary for the Court's review. (ECF No. 42 at 1–2.) The Court declines to consider the CVs as they are unnecessary to resolve the issue before it, but notes that even if it were to consider Dr. Grattan's CV, it still does not provide clear information on how long Dr. Grattan has been reviewing medical records in claims for LTD benefits.

20.  <u>Plaintiff's hired independent medical examiner, Dr. Mechel Henry</u>: As noted, Dr. Henry conducted an in-person examination on October 12, 2022, upon Plaintiff's appeal of Unum's denial.  (AR 5639–79.)  The Court notes that Dr. Henry's in-person evaluation of Plaintiff is of limited use, however, as it occurred after his September 2021 MVA and was less of an accurate reflection of what Plaintiff's abilities were around January 14, 2019.  Nevertheless, Dr. Henry concludes: "In addition to the low back pain and PTSD, anxiety and depression related to MVA in 02/2014, the history, exam and medical records today support multiple diagnos[e]s and injuries, which contributed to [Plaintiff's] inability to work in any sedentary occupation from January 14, 2019 to September 6, 2021, and forward."  (*Id.* at 5653.)  Specifically, Dr. Henry noted the following issues in Plaintiff's medical history led to her conclusion:

> [Plaintiff] had chronic low back pain since his MVA on 2/23/2014, where he sustained an L1 burst fracture and was also diagnosed with lumbar facet arthropathy, thoracic spine pain and cervical strain with facet arthropathy.

> [Plaintiff] had multiple complex issues with his upper extremities which support that he could not work in any sedentary occupation from January 14, 2019 to September 6, 2021, and forward. [Plaintiff] had left lateral epicondylitis, numbness in both hands, likely CTS or early peripheral neuropa[th]y, left wrist arthritis, and right shoulder pain/arthritis with tendonitis, all since or before 2017.  [Plaintiff] was treated conservatively, but these upper extremity issues contributed to his inability to work in any sedentary occupation from January 14, 2019 to September 6, 2021, and forward.

> [Plaintiff] had multiple complex issues with his lower extremities which support that he could not work in any sedentary occupation from January 14, 2019 to September 6, 2021, and forward.  [Plaintiff] had bilateral plantar fasciitis, arthritis right hip, and right knee OA, all since or before 2017.  [Plaintiff] was treated conservatively, but these lower extremity issues contributed to his inability to work in any sedentary occupation from January 14, 2019 to September 6, 2021, and forward.

> [Plaintiff] had a pulmonary embolism in 2014, requiring anticoagulation, which supports that he could not work in any sedentary occupation from January 14, 2019 to September 6, 2021, and forward.

> [Plaintiff] had severe [PTSD] after his 2014 accident, with depression and anxiety, which supports that he could not work in any sedentary occupation from January 14, 2019 to September 6, 2021, and forward.

> Any one of the above conditions could have alone led to [Plaintiff]

not being able to work in any sedentary occupation from January 14,
2019 to September 6, 2021, and forward.  However, the synergistic
overlap confirm [Plaintiff] could not work in any sedentary
occupation from January 14, 2019 to September 6, 2021, and
forward.

(*Id.* at 5653–54.)

21.   It is also unclear from Dr. Henry's CV how long she has been reviewing medical
records in claims for LTD benefits.  (*Id.* at 5680–82.)  However, her CV shows that from 2006 to
the present, she has been working as a private practice physician in sports, spine, TBI, and
trauma, and from 2004 to 2006, she was a partner at a sports and spine orthopedic clinic.  (*Id.* at
5680.)  The Court notes that, unlike Drs. Kim and Grattan, Dr. Henry obtained a full medical
history starting from Plaintiff's childhood through a direct interview (*id.* at 5640–45) and
provides a full and comprehensive list of all the records from doctors and medical practitioners
that she reviewed (totaling 3,732 pages), as well as a thorough summary of the highlights of her
medical record review and radiologic review (*id.* at 5656–79).  It is clear to the Court the exact
records that Dr. Henry relied on to make her findings.  Nevertheless, Unum's point that Dr. Henry
did not clearly explain how this clinical evidence is connected to the aforementioned findings is
well-taken.  (ECF No. 39 at 22.)  Accordingly, the Court finds her opinion is entitled to little
weight.

22.   <u>Unum's hired independent medical examiner, Dr. Arlen Green</u>: On Unum's review
of Plaintiff's appeal, Unum obtained an independent opinion from Dr. Arlen Green.  (*Id.* at 5703–
08.)  After reviewing "all the medical conditions and the treating providers' opinions individually
and in aggregate," Dr. Green concluded "the medical and file evidence does not support [R/Ls]
precluding the claimant from performing the occupational demands defined above as of 1/13/19,
including the information provided by the IME."  (*Id.* at 5703.)  In relevant part, Dr. Green also
concluded the following:

In reference to Behavioral health concerns, [t]he insured had a
diagnosis of [PTSD], major depressive disorder, marital problems,
and chronic pain.  These comorbid diagnoses of mental health
conditions are not impacting his ability to function within the
occupational demands described.  Although there were cognitive
deficits in language and recall, this was improved with cueing.  His

28

1
2
3
4

> mental status examinations were intact when evaluated by behavioral health clinicians. There was no evidence of psychomotor slowing documented by Dr. Wong. Given intact mental status examinations, these reported symptoms and behavioral health conditions are not resulting in the inability to function within the occupational demands described.

5
6
7
8
9
10
11
12

> As of 01/4/19 through 9/2021, physical examination findings were within functional limits. In reference to the chronic pain and L1 burst fracture, [h]e previously did have an L1 burst fracture however, this dates back to 2016, and further fractures are not noted as such, he is not precluded from the occupational demands described. It was stated on 01/12/19 that the MRI showed multilevel bilateral neural foraminal narrowing in the chronic L1 burst fracture however, on a bone scan there was no significant radiotracer uptake at the L1 compression fracture. The L1 burst fracture is chronic and does not preclude sedentary activities. Recovery time for burst fractures is 4-12 weeks in order to promote bone healing. On 08/05/19, examination reveals full strength 5/5, and sensation was intact. Gait was also normal, and reflexes were symmetrical. The examination findings noted above are not consistent with the reported level of pain or severity of functional impairment to preclude the insured from performing the outlined occupational demands as of 1/13/19.

13
14
15
16

> Electrodiagnostic studies were performed on 11/12/19, showing no evidence of ulnar or median neuropathy to support functional [R/Ls] regarding the upper extremities. Further x-rays of the left wrist on 03/02/21 showed no significant pathology, and x-rays of the right hip were normal. This is consistent with the capability of the claimant functioning within the occupational demands described.

17
18
19
20

(*Id.* at 5707.) Unum is correct that Dr. Green noted that Dr. Henry's exam ("most recent independent medical evaluation") found some mild weakness at 4/5 and some grip weakness, and that this was inconsistent with some of PT Jurado's findings in the 2018 FCE. (ECF No. 39 at 23 (citing AR 5707).)

21
22
23
24
25
26
27
28

      23. However, Dr. Green appears to repeat Dr. Grattan's mistake in confusing a mental status exam for a MOCA, noting that "On 09/02/21, he was assessed by Dr. Wong, who stated that he had some reports of memory loss. His mental status exam was 21/30." (AR 5704.) As previously stated, a MOCA does not receive a numerical score. Like Dr. Grattan, Dr. Green also reports Plaintiff's mental status exams were "intact when evaluated by behavioral health clinicians." (*Id.* at 5714.) As summarized previously, however, Plaintiff's multiple mental status exams with Hundley show depression, impaired memory, and a restricted affect. Additionally, Dr. Green never conducted an in-person evaluation of Plaintiff, never spoke to Plaintiff, and only

29

1   completed a file review.  In light of this, the Court finds Dr. Green's opinions are entitled to little

2   weight.

3          24.  **Weight of vocational experts**: "The opinion of a vocational expert cannot support

4   a denial of benefits unless the hypothetical used by the vocational expert includes all of the

5   claimant's functional limitations." *Bruce v. N.Y. Life Ins. Co.*, No. C 00-1516 MMC, 2003 WL

6   21005313, at *4 (N.D. Cal. Apr. 28, 2003) (finding vocational expert's report improperly

7   assumed plaintiff had ability to change postures without any limitations as to this ability and did

8   not account for plaintiff's limited ability to perform word processing for any significant period of

9   time); *see also Thomas v. Barnhart*, 287 F.3d 947, 956 (9th Cir. 2002) (holding, in social security

10  action, opinion of vocational expert was unreliable where expert did not include in hypothetical

11  claimant's limited ability to concentrate); *Lambert v. CWC Castings Div.*, 255 F. Supp. 2d 739,

12  742 (W.D. Mich. 2003) (holding, in ERISA action, vocational expert's report did not support

13  denial of benefits where hypothetical was based on functional limitations provided in unreliable

14  medical opinion).

15         25.  Here, as noted above, on July 20, 2022, Unum's vocational expert Marziali

16  identified the following light work occupations Plaintiff could perform: (1) Coordination

17  Preventative Maintenance; and (2) Safety Technician.  (*Id.* at 5461–64.)  Marziali relied, it

18  appears solely, on Dr. Kim's June 22, 2022 report and Dr. Grattan's July 5, 2022 report that

19  Plaintiff was not precluded as of January 14, 2019 through September 6, 2021 from: "Light

20  occupational demands on a full-time basis which consist of[:] lifting, carrying, pushing, and

21  pulling 20 Lbs. occasionally, frequently up to 10 Lbs. or negligible amount constantly; walking

22  and or standing frequently even though weight is negligible."  (*Id.* at 5462.)  When conducting

23  this vocational analysis, Marziali noted that Plaintiff's "GED levels are Reasoning 5, Math 4 and

24  Language 5."  (*Id.* at 5463.)  In the notation for "SSDI File Received" it appears Gentry or

25  Marziali (unclear which) entered "N/A."  (*Id.* at 5461.)

26         26.  In denying Plaintiff's claim for benefits and notifying him that his LTD coverage

27  ended as of January 14, 2019, Unum noted that its decision is based in part on Marziali's review

28  of Plaintiff's file and conclusion that his functional capacity "supported in the physician reviews

1   is compatible with" the occupations of Coordinator Preventative Maintenance and Safety

2   Technician.  (*Id.* at 5478.)  However, as stated previously, ALJ Thomasson concluded that

3   Plaintiff "is limited to work with a reasoning level of 2."[15]  (*Id.* at 2339.)  Appendix C to the

4   Dictionary of Occupational Titles ("DOT"), a reference manual published for ALJs by the U.S.

5   Department of Labor, explain that "level 2" reasoning jobs require a worker to: "Apply

6   commonsense understanding to carry out detailed but uninvolved written or oral instructions.

7   Deal with problems involving a few concrete variables in or from standardized situations."[16]

8   (ECF No. 38-1 at 8.)  The DOT classifies the two jobs that Marziali identified — Coordinator

9   Preventative Maintenance and Safety Technician — as requiring a reasoning level of 4.[17]  (*Id.* at

10  13, 15.)  Based on this, it is clear that Marziali's report did not consider ALJ Thomasson's

11  decision.  Marziali's opinion cannot support Unum's denial of benefits to Plaintiff because

12  Marziali did not consider all of Plaintiff's functional limitations.  *See Bruce*, 2003 WL 21005313,

13  at *4.  Accordingly, the Court finds Marziali's opinion is entitled to no weight.

14          27.  **Weight of subjective reports of pain**: It would be an abuse of discretion for the

15  Court to fail to consider Plaintiff's subjective account of pain.  *Kibel v. Aetna Life Ins. Co.*, 725 F.

16  App'x 475, 477 (9th Cir. 2018) (citing *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 904–07 (9th

17  Cir. 2016)).  As previously stated, during Plaintiff's January 2, 2019 physical exam appointment

18  Dr. Saqui noted Plaintiff's self-reports of the severity of his pain as follows:

19

20

21  [15]     As noted previously, the Court finds ALJ Thomasson's conclusions are well-supported.

22  [16]     As will be explained further in this Order, the Court grants Plaintiff's request for judicial
    notice of sections of Exhibits C, D, and E, the Department of Labor's ("DOL") Dictionary of
23  Occupational Titles ("DOT") Appendix C, the DOT definition of "Safety Inspector," and the
    DOT definition of "Preventative Maintenance Coordinator," respectively.  (ECF No. 38-1.)
24
    [17]     As Plaintiff notes, occupational descriptions "are followed by what is known as a
25  'Trailer,' which is a listing of the qualifications, such as language development ('L'), strength
    ('STRENGTH'), education level ('GED'), and reasoning level ('R') required by that occupation."
26  (ECF No. 38-1 at 2.)  These qualifications are represented by a number.  (*Id.*)  The DOL
    definitions for Safety Inspector and Preventative Maintenance Coordinator list "R4" in the trailer.
27  (*Id.* at 13, 15.)

28

31

> [C]hronic axial back pain and PTSD after MVA 2-23-2014, L118 burst fracture
>
> Mid back pain at a level of L1, constant, daily, intensity varies from 7 to 8, worse when standing 10 minutes or more, when leaning forward while standing, when walking downhill
>
> Associated tingling sensation in both lower legs, no weakness
>
> Does back stretching, walking as exercise 10 to 15 minutes at [a] time, total one hour 5 times a week

(AR 3573.)  Further, Dr. Bueff, his orthopedic consulting surgeon, noted on January 28, 2019 that Plaintiff's back exam revealed "pain in the upper lumbar spine in flexion" and "[d]ecreased [range of motion] due to pain."  (*Id.* at 3356.)  Plaintiff also reported at that appointment that his pain in his lower back was "6-8" and the pain in his arm was "5."  (*Id.* at 3362.)  In another visit with Dr. Saqui on October 30, 2019, Plaintiff reported numbness to both hands "worse when gripping and during cold weather" and that this impacted his ability to write, drive, and grip.  (*Id.* at 3672.)  Finally, during Plaintiff's appointment with PT Roa for physical therapy on September 1, 2021, Roa noted that Plaintiff presented "with significant activity intolerance" and "per subjective examination he has limited and painful active range of motion."  (*Id.* at 3136.)  In a list of goals, Noa noted "be able to tolerate standing for 60 minutes within 20 weeks" and "be able to lift 20 lbs to waist within 12 weeks."  (*Id.*)  Thus, the Court finds that Plaintiff's reports of pain are entitled to some weight.

28. The Court acknowledges the difficult task of administrators who must weigh evidence as they receive it and determine the credibility of disability claimants.  Despite this difficulty for administrators, the Court finds Plaintiff to be a credible witness.  Plaintiff worked for years with back pain and only ceased working after multiple attempts at pain management (namely, spinal injections and acupuncture) failed and his pain continued.  On balance, the Court finds Plaintiff adequately establishes by a preponderance of the evidence that he was disabled from any gainful occupation as of January 14, 2019.

---

[18]    The spine is divided into three sections: the cervical spine, which is the neck area; the thoracic spine, which is mid-back; and the lumbar spine, which is the lower back.  A fracture at "L1" indicates that the fracture occurred in the uppermost vertebrae of the lumbar spine.

1  **III.    REQUESTS FOR JUDICIAL NOTICE**[19]

2          A.    Defendant's Request for Judicial Notice

3      Unum requests judicial notice of Exhibit A, copies of the website and Volunteer

4  Requirements and Selection Criteria for a volunteer firefighter in California.  (ECF No. 37-1.)

5  Unum argues this information is "highly relevant because the crux of this case depends on

6  Plaintiff's functionality as of January 14, 2019 and beyond" and the "information shows the

7  requirements and criteria that Plaintiff satisfied to be a volunteer firefighter."  (*Id.* at 2.)

8      In response, Plaintiff filed a motion to admit his declaration, Exhibit F, as it addresses a

9  new issue Unum raises.  (ECF No. 38-2.)  Plaintiff notes that he disclosed to two of his treating

10  practitioners that in July 2021 he went out on a single call as volunteer firefighter.  (*Id.* at 2.)

11  Plaintiff argues that under *Collier v. Lincoln Life Assurance Co. of Bos.*, 53 F.4th 1180, 1182 (9th

12  Cir. 2022), it is improper for Unum to raise new issues in litigation the insured has not had an

13  opportunity to address.[20]  (*Id.* at 3.)

14      Unum filed an opposition to this motion, arguing it is not raising a new issue and it is not

15  contending Plaintiff's volunteer firefighting and credibility were rationales communicated to

16  Plaintiff in its decision letters.  (ECF No. 41 at 6.)  Unum argues referencing record evidence

17  regarding Plaintiff's reported volunteer firefighting does not create a new issue but adding

18  Plaintiff's declaration could constitute adopting a new litigation rationale in violation of *Collier*.

19  (*Id.* at 6–7.)

20      In response, Plaintiff asserts that Unum failed to raise this issue during the administrative

21  appeal, raised a new issue in litigation, and supported the issue with non-record evidence to create

22  the false impression of Plaintiff's health and activities as a firefighter.  (ECF No. 45 at 1–2.)

23

---

24  [19]    The Court notes Plaintiff filed an additional request for judicial notice.  (ECF No. 36-1.)
25  However, the Court declines to rule on this request as it does not rely on any of the documents
    Plaintiff attempted to judicially notice in this Order.

26  [20]    The parties raise additional arguments in their briefing on the issue of Unum's request for
27  judicial notice of Exhibit A and Plaintiff's motion to admit his declaration.  (*See* ECF No. 38-2 at
    3; ECF No. 41 at 5–6; ECF No. 45 at 1–3.)  However, because Exhibit A is barred from
28  introduction by *Collier*, the Court declines to consider these additional arguments.

1   Plaintiff argues Unum's objection to his declaration is misleading because it attempts to obscure

2   the fact that he only submitted new evidence in response to Unum's new evidence.  (*Id.* at 2.)

3           When a district court reviews a plan administrator's denial of benefits *de novo*, it "must

4   base its decision on the administrative record and may supplement the record 'only when

5   circumstances clearly establish that additional evidence is necessary to conduct an adequate *de*

6   *novo* review of the benefit decision.'"  *Collier*, 53 F.4th at 1186 (citing *Opeta v. Nw. Airlines*

7   *Pension Plan for Cont. Emps.*, 484 F.3d 1211, 1217 (9th Cir. 2007)).  The Ninth Circuit has

8   strongly emphasized that "a plan administrator undermines ERISA and its implementing

9   regulations when it presents a new rationale to the district court that was not presented to the

10   claimant as a specific reason for denying benefits during the administrative process."  *Id.* at 1186–

11   87 (citing cases).  In *Collier*, the Ninth Circuit agreed with the plaintiff that the district court erred

12   "when it relied on rationales that [the plaintiff] did not raise as grounds for denying her claim for

13   benefits," as the plan administrator did not cite the plaintiff's "lack of credibility or the lack of

14   objective evidence when it denied her claim initially and on review."  *Id.* at 1187.  The Ninth

15   Circuit found that because the plaintiff did not waive these arguments and the plan administrator

16   failed to raise them during the administrative process, the plan administrator "effectively

17   sandbagged" the plaintiff with new rationales at the trial briefs stage "where she could not

18   meaningfully respond."  *Id.* at 1188 (internal quotations and citation removed).

19           Here, similarly, had Unum cited Plaintiff's physical abilities and meeting the requirements

20   and criteria to be a volunteer firefighter as a reason for denying benefits in the administrative

21   process, then the Court "would have been within its province to review the administrative record

22   and determine whether the evidence supported that decision."  *Id.* at 1188.  In the process of *de*

23   *novo* review, this Court "must examine only the rationales [Unum] relied on in denying benefits

24   and cannot adopt new rationales that [Plaintiff] had no opportunity to respond to during the

25   administrative process."  *Id.*  Unum does not cite Plaintiff's physical abilities for volunteer

26   firefighting in its denial of Plaintiff's claim on August 5, 2022 (*id.* at 5471, 5473–83) or in its

27   upholding of the denial of Plaintiff's claim on appeal on March 10, 2023 (*id.* at 5725 – 32).

28   Plaintiff is further correct that this issue is not raised by any of Unum's physicians or independent

1    medical examiners at any point throughout the administrative process or any of Unum's briefs on

2    the issue of long-term benefits in the first case.  (ECF No. 45 at 4.)  Accordingly, Unum's request

3    for judicial notice of Exhibit A is DENIED and Plaintiff's motion to admit Exhibit F, his

4    declaration, is DENIED.

5                    B.    Plaintiff's Request for Judicial Notice

6           Plaintiff requests the Court take judicial notice of sections of Exhibits C, D, and E, the

7    Department of Labor's ("DOL") Dictionary of Occupational Titles ("DOT") Appendix C, the

8    DOT definition of "Safety Inspector," and the DOT definition of "Preventative Maintenance

9    Coordinator," respectively.  (ECF No. 38-1 at 1, 4.)  Plaintiff asserts the DOT pages do not add to

10   the administrative record but serve as a technical aid to explain what is already in the record —

11   namely, ALJ Thomasson's restriction to work involving reasoning level 2 and the DOT

12   definitions for Unum's two proffered occupations, Safety Inspector and Preventative Maintenance

13   Coordinator.  (*Id.* at 3.)  Plaintiff notes that both jobs are in the record and show the number "4"

14   but without the letter "R" and there is no further explanation.  (*Id.*)

15          Unum objects, opposes, and moves to strike Plaintiff's request for judicial notice of

16   Exhibits C, D, and E.  (ECF No. 40 at 4, 19.)  Unum asserts the Court does not need an aid to

17   interpret the detailed ALJ denial of benefits.  (*Id.* at 4–5.)  Unum further asserts Plaintiff did not

18   raise this issue or any vocational issues during the administrative process or in this case even

19   though he had opportunities to do so during the claim and appeals process.  (*Id.* at 5, 14–16.)

20   Unum contends the framework outlined in *Mongeluzo v. Baxter Travenol Long Term Disability*

21   *Benefit Plan*, 46 F.3d 938 (9th Cir. 1995) and *Opeta v. Nw. Airlines Pension Plan for Cont.*

22   *Emps.*, 484 F.3d 1211, 1217 (9th Cir. 2007) can be used to deny a judicial notice request for

23   portions of the DOT that are not in the administrative record.  (*Id.* at 16.)

24          In response, Plaintiff contends Unum's supposed objection is a disguised merits brief to

25   reargue the merits of its denial and is not allowed by this Court's orders, as pages 3 through 13

26   detail the ALJ's rationale for finding Plaintiff physically capable of light work, which has nothing

27   to do with Plaintiff's request.  (ECF No. 44 at 1–2.)  Plaintiff contends Unum does not dispute the

28   factual predicates involved with his request or that the two jobs identified by its denial letter as

1    occupations with Plaintiff's capacity (Safety Inspector and Preventative Maintenance

2    Coordinator) require a level 4 reasoning ability.  (*Id.* at 2–3.)  Plaintiff maintains that the jobs

3    identified by SSA are not relevant and under *Collier*, 53 F.4th at 1180, if the Court finds Plaintiff

4    cannot do the Safety Inspector and Preventative Maintenance Coordinator jobs on which Unum

5    based its denial, it cannot then approve the denial based on different jobs.  (*Id.* at 3.)

6          "Under *de novo* review, the district court considers only evidence in the administrative

7    record and other evidence as might be admissible under the restrictive rule of *Mongeluzo*[.]"

8    *Sund v. Hartford Life and Accident Ins. Co.*, No. 21-cv-05218-JST, 2023 WL 5181624, at *13

9    (N.D Cal. Aug. 11, 2013) (internal quotation marks omitted) (quoting *Opeta*, 484 F.3d at 1217).

10   Pursuant to this approach, "the district court can consider extrinsic evidence only under certain

11   limited circumstances, and only when circumstances clearly establish that additional evidence is

12   necessary to conduct an adequate *de novo* review of the benefit decision."  *Id.* (quoting *Opeta*,

13   484 F.3d at 1217; *Mongeluzo*, 46 F.3d at 944).  There is a split in the Ninth Circuit as to whether

14   to apply the *Mongeluzo-Opeta* framework when presented with the question of whether to

15   consider portions of the DOT not in the administrative record.  *Id.* (citing cases).  This Court,

16   however, like many others, is not persuaded that it needs to adopt the *Mongeluzo-Opeta*

17   framework to consider DOT excerpts, as the "DOT has been recognized as a widely used and

18   reasonable reference for administrators and courts to use under ERISA in order to conduct a

19   vocational analysis."[21]  *Id.* (internal quotation marks omitted) (citing cases).  Further, reference to

20   the DOT pertains to a legal issue, not a factual one.  *Id.*

21         Further, the Court disagrees with Unum that this case "does not involve any vocational

22   issues."  (ECF No. 40 at 19.)  Plaintiff correctly notes the two jobs Unum identifies have specific

23   requirements and it is an issue in this case as to whether Plaintiff could have met those

24   requirements on January 14, 2019.  (ECF No. 44 at 4.)  Accordingly, the Court may consider

25

26   [21]    Even under the application of the *Opeta-Mongeluzo* standard, however, the Court would
     conclude that the "circumstances clearly establish that" consideration of Appendix C and the
27   vocational definitions are "necessary to conduct an adequate de novo review of the benefit
     decision."  *Opeta*, 484 F.3d at 1217 (emphasis omitted).
28

1    DOT excerpts not in the administrative record.  Therefore, Plaintiff's supplemental request for

2    judicial notice is GRANTED and Unum's motion to strike is DENIED.

3    **IV.    CONCLUSION**

4           For the foregoing reasons, the Court finds that Plaintiff was disabled within the meaning

5    of the Policy as of January 14, 2019, and is entitled to long-term disability benefits as of January

6    14, 2019, without prejudice to Unum's future exercise of its rights under the Policy.  Accordingly,

7    Plaintiff's Motion for Judgment (ECF No. 36) is GRANTED, Unum's Motion for Judgment

8    (ECF No. 37) is DENIED, and Unum's Motion to Strike (ECF No. 40) is DENIED.  The Clerk of

9    the Court shall enter judgment in favor of Plaintiff and against Unum and close the case.

10          IT IS SO ORDERED.

11   Date: June 16, 2025

14   _____

15   TROY L. NUNLEY
     CHIEF UNITED STATES DISTRICT JUDGE